My client's Fourth Amendment rights were violated because he was seized without reasonable suspicion based on a missing person's report that had already been resolved. Certainly, we do not dispute as a general matter that police can question a person based on a missing person's report that has already been resolved. I would like to reserve two minutes for rebuttal and I will try to keep my eye on the clock. And that's not what happened here. I think that it's fair to say that you can stop someone. Someone could stop me on the street and say, look, there's a missing person's report. Do you know something about this person? You know, let's say it's they have, you know, some reason to think that I might know something. But that's not what happened here. I mean, they actually are sort of executing a full Terry stop. And for that to execute a full Terry stop, you need reasonable suspicion of criminality. But I'm just not persuaded. I don't see how they execute a full Terry stop. They didn't pat him down. They didn't even, they hadn't even sort of reached him. They said, you know, even before they got close enough to pat him down, they said, hey, you got anything I have to know about? He could have said no. He could have said, mind your own business. He could have said, I don't have to answer that. Instead, he says, yeah, I got a gun. Well, at that point, they get his gun. You know, what are they going to do? Well, there was no, you know, you want to say it's a full Terry stop. A full Terry stop is when they say, raise your hand and I'm going to start patting you down and feeling your body. Well, they actually, I mean, the magistrate found that he was, before they asked the question, do you have a gun? The magistrate found that he was detained, that he was not free to leave, that he was ordered to the front of the car and to raise his hands. This is a somewhat different stop from an ordinary traffic stop in that we have two police cars. One comes behind and one comes in front. And it strikes me at that point, if the question is, did he feel free to leave? I think the answer is no. That's what the magistrate found, correct. I think he has been detained as of this moment, before he gets out of the car. Now, he might have looked furtive and might have looked as though he was going to run. That's what the officer testified. The officer then said, stop and tell me if you got anything. But it seems to me that he was, a reasonable person would have thought he was not free to leave once he has a cop car in front of him and a cop car behind him. I think that's correct. And what flows from that? Has he then been detained without reasonable suspicion and anything discovered during the course of that detention has to be suppressed? Is that your argument or is there some other argument? That is my argument. You may be persuaded, counsel, but I'm not persuaded. Well, as a factional. Why, I mean, he stopped and got out of the car. He wasn't driving anywhere. The fact that you're hemmed in by police cars, you know, if you were sort of about to drive away and they sort of cut in front of you, you can't go anywhere. But he was getting out of the car. He had gotten out of the car already and they put the police cars there to keep him from driving off. Had they actually said you can't leave on foot? They didn't have to say he can't leave. The answer is no. The answer is no. They didn't say that, no. But the magistrate found. What was the sequence of communications? The sequence is that he steps out of his car. He is sandwiched by the police officer. This is what the magistrate found. He parks the car. He steps out, right? Because it's in front of his house. He has turned off the ignition. He's left the car. He's about to make his way on foot somewhere. He's sandwiched between two police cars. He's told to raise his hand, ordered to the front of the car before he's ever asked a question about a gun. And the magistrate found it's an uncontested finding that he was detained at that moment and he was not free to leave. To make that kind of detention, I think you need reasonable suspicion of criminality. That is not just asking about a missing person's report. And in this case, the report that the officer made never even mentions any follow-up on a missing person's report. And he never, even in his testimony, he never gets to the missing person's report until he's executed a full arrest, talked about the gun, done a records check. I mean, the thing is entirely a done deal before he even suggests that he mentions, that he doesn't follow up on the missing person's report. So that leaves a real question as to whether this is what motivated his stop. It doesn't really matter because at some point he doesn't have a gun, and then the whole missing person's report steps in the background because now he's got a gun. Right. But if his true motivation was to find out about the missing person's report, he wouldn't have had to execute this kind of stop without reasonable suspicion of criminality. And he could have simply, and I think which is the proper thing to do, simply say, do you know anything about this missing person's report? Oh, it's cleared up. Thank you very much. You may go into your apartment now. That's not what happened. So I'd like to reserve the balance of my time, if I may. Okay, we'll hear from the government. May it please the Court. My name is Andrew Duncan. I'm an assistant U.S. attorney in Las Vegas for the District of Nevada, and I represent the appellate United States. Government is going forward here on two separate theories, one that the officer did have reasonable suspicion at the time he had contact with the defendant, reasonable suspicion that criminal activity was involved. And second, the government is going under the theory of the caretaking policy, and we're urging this Court to follow the community caretaking function. Let's talk first about the community caretaking function and what we have in this particular case. We have a police officer on patrol after 2 a.m. in the morning in a high-crime area, as he testified based on his experience working in that area of Las Vegas. He, at some point during his patrol, sees this vehicle and runs the plate. What does the officer hear when he runs the plate? He hears that, A, this is a suspicious vehicle, and, B, that this vehicle is somehow involved with a missing person. And on the record at the time of suppression, he explained what that meant, is that someone involved had reported that this vehicle was either owned or had some relationship to a missing person. Well, you said A and B. What was the A? A was that he had a report that this vehicle had been reported as a suspicious vehicle at some earlier time. What does that mean? Was it something aside from the missing person's report? It was. Apparently at some point this vehicle had been pulled over, involved in what was considered a suspicious vehicle. At least that's what he knew at the time. And do we know anything more than report as suspicious vehicle? No, he did not know anything. Now, he had been pulled over a week before in connection with the missing person. Are you sure that that's not the same pullover? But I'm saying what the officer knew that night, and what the officer knew that night was what he was dealing with was a vehicle that had been pulled over as this suspicious vehicle and the fact that there was this missing person. But you have to tell us a little more about the suspicious vehicle designation because it's a little suspicious in itself to have the police designating things and maybe people as suspicious, just sort of a suspicion in the air. I mean, I understand theft, you know, possible stolen vehicle. A vehicle that's possibly involved in a crime, I understand that. A vehicle that's been involved with a missing person, I understand that. But sort of a general designation of suspicious, I am a little suspicious about police having that kind of thing in their computer, sort of a blanket designation of suspicious. So what is this animal? As the officer explained at the suppression hearing, that the Las Vegas Metropolitan Police Department could have various reasons for saying that the vehicle was suspicious. For example, he explained that there could be a reason that a member of the public reported that vehicle as perhaps being involved in some sort of crime. So there were various reasons. But we concede the fact. Could it be that the suspicious vehicle report is the result of the prior stop? Yes. Yes. And we're not denying that. What I'm trying to get across to the Court is this is what the officer is faced with at 2.30 a.m. that morning. Well, I understand. But you're trying to get extra momentum from this designation of suspicious vehicle. And if it's garbage in, we don't know what it is. It could be anything at all, including being cleared of being involved with a missing person. Any of us could have vehicles that have designation of suspicious or the police for no particular reason. This reliance on databases, as the Supreme Court has told us, is to a great degree dependent on our understanding of the integrity of the database and that the inputs are in some ways controlled to make sure that the things that designate something as suspicious are reliable and kept up to date. And you're standing there and telling me this was designated as suspicious vehicle with no ability to tell me anything more and tell me, you know, I've got to give extra deference to the officer because his designation just makes me sort of uncomfortable, really. And I know it's actually sort of detracts from the other thing. Unless you can show me something that says that this is really something that is reliable, that is kept up to date, that has a meaning other than some cloud of suspicion. Perhaps I can clarify our position. I'm just trying to give you a chance to do that. Our position is that even without that report, take out the suspicious vehicle out of the equation here. You're the one who said AMB, and you're the one who's been standing there for the last three or four minutes trying to persuade us that there was more than a missing person or a missing person report. There was this other thing here that we ought to give extra deference to. Now, if you want to back off on that and say it's not AMB, it's only B, forget A, then we'll have to consider that. Allow me to clarify. For the community caretaking function, it's the government's position that it is enough that the officer is out patrolling and he has received information that this vehicle is involved in a missing person's case. That's your B. I understand. We can talk about B, but are you backing off A? Are you saying A? As to the community caretaking function, correct. As for whether or not he had reasonable suspicion... No, let's go back. You said you've got A and B, and B was going to be your community caretaking function. You said there was something else. B is... He had two things. He has community caretaking function, which is B, and then he had this suspicious thing here going, which is A. Right. And the community... Community caretaking doesn't have A in it. That's only B. I'm just saying we're relying just on the community caretaking function. You're backing off the other stuff. I will address the community caretaking. It's the government's position that this officer... You're not answering my question. Are you relying on this other thing, in which case we need to keep discussing it until I understand it, or are you giving up on it? In small part, we are relying on it as... Tell me how. The totality of the circumstances... Tell me how if we don't understand what this thing is. We can keep talking about it until I understand. If you're relying on it, if you want to get some mileage out of it, if you want us to give your case additional, or you know the officer additional deference based on this, you're going to have to tell us what this thing is and how it's reliable, how it came to be in there, and how the officers relying on this thing is reasonable. So keep talking if you want to, or give up on it. I don't know. We'll concede... Do the best you can do. We'll concede that issue and simply state that under the community caretaking function, it is enough that the officer has this information that this car is involved in a missing person's case. Let me make sure I understand what you just conceded. You said, we will concede that issue. Let me ask you what you conceded. Did you concede that there was no reasonable suspicion to make the stop, and you're now relying on community caretaking? What did you just concede? That in the community caretaking function, it is not necessarily part of our argument that he had any suspicion, that there was a suspicious vehicle. I see. So you're still saying that there was reasonable suspicion? Correct. And you're saying that there was reasonable suspicion at the time the two police cars sandwiched this vehicle, they had reasonable suspicion that there was criminality going on? Correct. Based on what? Correct. Based on the fact that all of the factors taken in total. And what are those factors? The factors are that, again, not to go into this too much, the previously suspicious vehicle, the fact that this vehicle is involved in a missing person's case. I think we're back to fair base. The fact that there are other factors as well, that this defendant accelerated away from the police officer and took what the police officer viewed to be a basic action. Accelerated away from the police officer and parked on the other side of the street a block away? Is that what you're saying is suspicious? This is earlier in the sequence of events. Well, I understand. There were two times. He accelerated and he followed because he thought that this was sort of suspicious. Correct. He then stops his vehicle. He gets out, goes up to the second floor, pounds on the door, comes back down again, then gets back in his vehicle that has the windows down, and I'm not sure why having windows down at 2.30 in the morning in Las Vegas is all that suspicious, but in any event, does a U-turn, accelerates, comes back and parks on the other side of the street a block away. That's suspicion of criminality? It's our position that when you take all of the circumstances. But that's one of the circumstances that leads one to believe to what you say is the reasonable suspicion of criminality? That's correct. Why is that suspicion of criminality? He seems not to be fleeing. He's driving too fast and he's making U-turns that might be illegal, but I don't think he's after him for a traffic violation. What the officer testified to is that based on his training and experience, this was an individual who was trying to evade him by taking quick turns and by accelerating away. He tries to evade him by parking in front of an apartment house, going up to the second floor, coming back down, and then taking off and parking a block away? He's not a very successful evader if that's evasion. Well, his testimony was that he tried to evade him in the initial sequence of events and then after that he pulls up to the apartment, runs up to an apartment, leaving the windows open, which based on the officer's training and experience in that particular neighborhood in Las Vegas would be very unusual. Because? Because it's such a high-crime area with such a high rate of car thefts and other property-type crimes. Does it become less unusual when he realizes that he's gone upstairs only to come back downstairs again immediately? It does become less unusual under those circumstances. So let me make sure then, and I don't want to leave anything out and I don't want to unduly prolong this, just the list of things in your view that amount to reasonable suspicion that justify the detention when they stop the car and put the police cars in front and behind. The suspicious vehicle report, the NCIC missing person report, and the behavior in driving his car. That's it? Or is there more? That's correct. And then his behavior at the final stop when he gets out of the car. No, no, no. I'm asking did they have reasonable suspicion when they boxed in his car? Up to that point, those are the factors we view as reasonable suspicion, correct. Got it. Okay, thank you. In your view, that amounts to reasonable suspicion. You say these are the factors that go towards, but do you think that amounts to reasonable suspicion? Correct. That's our position, that he had reasonable suspicion, but it's also our position, as we noted, in regard to the date this happened. Yes. What date was it? It was in December. I believe it was December 12th, December 19th. Now, why didn't you challenge the magistrate judge's finding that there was no reasonable suspicion? Because you did file something in the district court with the district court when there was a challenge. You said nothing about any disagreement with the magistrate's decision that there was no reasonable suspicion. Correct. It's our view that that issue was not waived by doing that. I believe that's the – Well, no, I understand that there's a waiver question coming in a minute, but I didn't quite ask you that. I said, why didn't you challenge it? Because the government had been successful – On this cockamamie community policing argument? On the community – yes, on the community care argument. On the caretaking argument? Yes, and it was our position that the other argument had been fully – There would be a record before this court in regard to that, as the record was fully explored in regard to the reasonable suspicion. In fact, primarily that's what was argued in front of the federal magistrate. You said that was – what's your premise? What was argued in front of the magistrate judge? The reasonable suspicion issue was fully briefed and argued, and there was a record created for this court in order to review reasonable suspicion. Let's say we wind up not agreeing with you that there was reasonable suspicion. I understand your position to be that you can detain somebody and do a full carry stop. Not that there necessarily was a full carry stop here, but I think it would be your position that you can do a stop, you can do a detention of a person, just based on the community caretaking function. Correct. And what's your best authority for that? We would – it's a little counterintuitive. It's one thing to say, look, the police have community caretaking functions, and so they can ask questions, they can even knock on doors and say, you know, there's a missing child, you know, have you seen, have you seen? Nobody disputes they can do that. It's a whole different proposition to say that in performing those functions, they can treat people they deal with as if they were suspects of crime. And, you know, Terry was, in fact, limited to situations. Now, maybe the Terry rationale extends to any situation where the policeman comes with a hand reach and you can say, well, he's entitled not to be, you know, to protect himself, to pat somebody down, but it's a much more comfortable position than saying, to say that, well, we suspect somebody of crime, this is somebody we have reason to, or, you know, whatever standard it is, find the suspicion to believe is involved in criminality. And, you know, the criminality aspect of it then raises the inference of danger, where there's any number of things a policeman can do under the – or any peace officer, policeman, fireman, whatever, can do under the caretaking function that would bring them into contact with people that have nothing to do with crime. And I'm just wondering where you get this authority to say, well, they can pat down anybody to talk to. As noted by the Court, I don't believe there's any specific authority either for or against this specific sort of thing in the Ninth Circuit. We're going to be writing the opinion that's going to decide this issue in the first instance. And let's say I were writing the opinion. I don't know who's going to write their opinion, but one of us will. Give us a little help on how we would write it to come out your way. How would we explain this to our friends and neighbors and people in the community who would have to explain what we are now saying the police might do? How would we make this acceptable and, you know, people say, yes, that's a wise exercise of constitutional authority? Our Fourth Amendment analysis has always dealt with a balancing test. And I would submit to the Court that our position is that the Court rule that the public interest in finding missing people in this particular case outweighs the ---- But nobody keeps the police from walking up and saying, sir, your car is involved in a missing persons report. Would you be kind enough to talk to us about it? Because we're concerned that this person may be missing, and I was wondering if you know who they were. You know, people are worried about her. You know, in a polite, friendly, non-coercive way to seek information about the owner of the car or let's say there's a child missing in the neighborhood, politely knocking on the door and saying, have you seen this child, have you seen, you know, there's nothing that prevents them from doing that. They don't have to say, hey, buddy, you can't go anywhere. Raise your hands up and up against the car. They don't have to do that. There may be circumstances where what you're saying is the correct course. However, each case brings up different circumstances, and in this case the circumstances were a little bit different where they felt they have this report of a missing person. They feel that this individual is about to flee. He's looking furtively in both directions, so they tell him to stop. Officers did that. When did the detention begin, when they sandwiched his car in, or did it only begin when they told him to stop and don't run away? It would be our position that it's when they tell him to stop and don't run away. But this is not an ordinary traffic stop. We all know an ordinary traffic stop. The cop comes up behind you, and you either get out of the car or you don't get out of the car. But this is a very unusual traffic stop where the subject vehicle is boxed in. Right. At that point, though, he's still free to continue about his business. Or is he? Would a reasonable person think that he's free to continue about his business when the cops have one behind and one in front? I don't think I would. Well, it's certainly our position that it's only when they see the defendant looking furtively and they feel he's about to run away. Maybe they would and maybe somebody would and maybe somebody wouldn't on their own, but that's not all that happens. So it's not just that the police are on either side. I mean, he may just say, well, okay, they boxed me in. I'm not driving anywhere, but I'll just go about my business walking around. But the police at that point give an order, stop. And stop from the police doesn't mean, hey, stop if you feel like it. It means stop, and there's an implicit threat that if you don't do what they say, they might tackle you or shoot you. I mean, there's no doubt about that. And if you at that point say, no, I'm not going to stop. I'm going to instead reach into my pocket or vest or, you know, then you have a pretty good chance of being shot at that point. And then they say stop, and they say stop and up against the vehicle. Do I understand the sequence of events correctly? Correct, and I'll agree with the court. So at that point he's not free to leave, is he? I'll agree with the court on that, yes. I think at that point if he had said, well, no, thank you, I'd rather not, and decided to walk away, he would have found himself tackled or manhandled, right? He would have been detained, correct. Yes. He would have been forcibly held there, yes. Yes. I mean, they probably would have given him another order, stop, or, you know. Something would have occurred to keep him there, yes. So it's not quite right to say, as I think you, I heard, I assume you said to Judge Fletcher that he could have just gone about his business. As soon as the police said stop, he was in their control until they released him. Correct. Okay, so that's where we are. The question is, putting aside the question of whether there was suspicion of a crime, which I don't think you have much to go on, can the police do that for community caretaking purposes? Again, it's our position that yes, that this is a balancing test, and that the public interest in finding, in this case, a missing person, is outweighing the intrusion into this individual's liberty. On the prior, when Mr. Willis had been stopped the week before, were there two cars involved in that? I don't know if the record is clear. Did they sandwich him in on the previous stop? I don't know if the record is clear on that, and I'm unaware as to. I think I understand why an officer at 2.30 in the morning in that area might have called for backup, but why did they feel the need to box him in? Did the officer testify to that? Based on the fact that they wanted to speak, I don't think he testified to that on the record. We could have had one officer pull up behind him and another one sort of pull across the street just as sort of a show of force, but I'm here in case there's any trouble in this area, without boxing his car in, right? It could have happened that way, correct. This is a little overbearing. Well, it's our position that the officers. For a community caretaking theory, that's a little overbearing, isn't it? It's our position that they wanted to get to the bottom of what had occurred there, and under all of the circumstances, you know, at that time of night in that neighborhood, they felt that this was the appropriate way to, you know, to go about their patrol. Okay, thank you. I think you may have a minute left for a bottle. A minute is 17 seconds. Okay. There's just a few points I want to make. In terms of the reasonable suspicion, I think the Court has had obviously a lengthy discussion of that. Not only did the government not sort of challenge the finding that there was no reasonable suspicion, but the magistrate's report doesn't actually have any findings that there was a traffic stop, any evasion. And in arguing the issue at the hearing, the government admitted that they could articulate no crime, that they could think of that they actually believed this person to be committing, other than a possible traffic stop, which the magistrate then decided not to rely on. He also made no credibility determination on Officer Bromer on the traffic issue. So there's sort of nothing to rely on there for reasonable suspicion. The government, I mean, the officer. The magistrate judge made no credibility finding with respect to what? To the traffic, a possible traffic violation, because he found that there was no traffic stop. And so he sort of put that issue aside and says, I think. Something about he made no credibility finding with respect to officer, and then I didn't hear what you said. He made no credibility finding, and I think he says this at page 151, but I'm not sure. It's in his report. He found it unnecessary to assess Officer Bromer's credibility with respect to a possible traffic violation. I see. So he just put it. He just puts that aside. Even if true, irrelevant, in his view. Yes. Yes. Also, the suspicious vehicle issue, the magistrate notes in his report that that's sort of not criminal and can be done by a citizen. And the officer in his testimony at page 55 says the person can be lying. So it's totally unreliable information. Let's talk about that. You know, it's easy enough in theory sitting here in San Francisco in daylight to say, you know, the officers get this missing person report, and they can just so politely walk up to somebody and say, excuse me, sir, do you know anything about this? But there are officers on patrol. They say this is a bad neighborhood, and we know there are bad neighborhoods. I mean, if you ever try to get outside the courthouse here at night, which some of us have done from time to time, you know, it's not a totally comfortable situation. Eleven people have been mugged, and things do happen in this very neighborhood. And so they have somebody who is they do want to talk to, and they have good reason to talk to, and they have a legitimate community reason to talk to. Let's say there's not suspicion of a crime, but they worry that the guy, you know, it's nighttime. It's the middle of the night, and they worry that the guy might have a gun or that, you know, might go down hard. And so they do, you know, they want to approach him and make sure that he has another weapon. That doesn't strike me as unreasonable. It also strikes me that if we say police can't make sure that the person they're talking to is unarmed, that maybe they will say, well, you know, this community caretaking function wasn't one of the things I was hired to do. I'm here to fight crime, and the next time I find a missing person or a missing car report, I'm just going to let them go because I don't want to put my life on the line talking to some guy about a missing car and having them pull out a knife and stab me in the gut. That's not an unrealistic thing to attribute to officers, is it? An unrealistic concern. Well, I think that the concern is always there for officers, and the test is fairly clear about what they can do in terms of, I mean, we've talked about this. We're writing on a clean slate as to what they can and cannot and should and should not be able to do when they approach somebody. I mean, put aside the question of suspicion. We'll come out on that as we come out with it. But assuming that we say, no, there was no suspicion of crime. So we are purely in the community caretaking area. We're going to say what is reasonable for an officer to do, and there's the model of going through a nice middle-class neighborhood in the middle of the afternoon and knocking on doors and having, you know, maids or housewives or househusbands or whatever open the door and they say, excuse me, have you seen a missing child? You know, you have that model. And then you have the model of police patrolling in the middle of the night in a neighborhood that's known to have a lot of crime where they really do take their lives in their hands every time they approach somebody. That's not an unreasonable concern. And I don't know that we can have the same model apply to every kind of police encounter involving community caretaking function. Why isn't it better to say, why isn't it more appropriate to say, look, if it's a legitimate police function, if it's something that police may legitimately do, and there's some things they can't, but there's some things they can legitimately do, and it requires them in performing that function to approach somebody to within the proximity where they could be hurt, then they are entitled to take such measures as is reasonable in the circumstances to make sure that the person they're approaching doesn't harm them. Why isn't that a reasonable rule? And, of course, if you're knocking door to door in a middle-class neighborhood in the middle of the afternoon, you deal with things differently than if you're in the middle of a bad neighborhood at night in the middle of the night. Why isn't that a better rule? Why isn't that the appropriate rule? Well, I think what's problematic about it is that what do police do that sort of isn't in the interest of general public safety? I mean, I think there's the possibility here that it's just going to swallow the rule of Terry, which is you actually need to have reasonable suspicion of criminality to do a Terry stop, and you can't do a suspicionless stop, and also the Supreme Court language in Katie, which was sort of the very original. You have to read Terry in light of its facts. What Terry said, I mean, there are two ways of reading it. One of them is to say, well, when you have suspicion of criminality and therefore approach somebody, then you sort of start with a presumption they're criminal and therefore have cause. The other way of looking at it is to say, look, when suspicion of criminality gives you a reason to approach somebody, then you apply a balancing test. But it doesn't in that reading exclude the possibility that police could approach you on something other than suspicion of criminality, and you still do a balancing test, and you do a balancing test based on the full set of circumstances that may wind up being a little different than when you have suspicion of criminality, because suspicion of criminality does give you an extra, you know, addition. Leg to stand on. Yeah, but when they stop you on a traffic stop, that's criminality, too, and yet we wouldn't say that that necessarily was a Terry stop. Right, but the court has said in the traffic stop situation that you can't sort of expand a traffic stop to be more than the scope of a traffic stop unless you have reasonable suspicion to believe that there's something more. And so once you're in that situation, you actually do need something more to expand what it is that you're doing, and that's exactly what I'm advocating here to be the rule, which is you can stop. You can, you know, sort of make an inquiry as to a missing persons report and say, do you know about this, but only on reasonable suspicion can you expand that into something else, which is, like here, a full-scope detention where you're ordered to put your hands up. I mean, that's something different. To a question I asked you when you were doing your first argument, which is what should the officers have done here? Where did they cross the line? What are the limits of what they should do here when they've got the missing persons report? They should let the guy go at 2.30 and hope to find him during the day or hope that he does something or sort of track him, sort of follow him around, stalk him, so that they can wait and see until he trips up and doesn't come to a full stop at a stop sign? I think there's two answers, and it depends on the facts. But in this case, I think, you know, sort of going back to what Judge Fletcher was talking about, they sandwich him between the cars and order him to put his hands up, and I don't think without reasonable suspicion that they have a basis to do that, and there's not that basis here. So I think that goes over the limit. But that's something short of that. An officer pulling up behind him with the other officer sitting across the street as sort of a backup in case of a problem in a tough area would have been okay. And you make an inquiry akin to sort of a very traditional traffic stop where you get out of your car, you look around, you approach the person, and you say, do you know anything about these missing persons? And then only can you sort of expand the scope of that inquiry if you have reasonable suspicion to make it something else, a different kind of stop. It's permissible for the officer, if the officer had been behaving in the way that you and Judge Bybee just discussed, that if there's one officer in his car immediately behind Mr. Willis' car, another officer across the street for backup in case of trouble, Mr. Willis gets out of the car, and the officer says, do you have anything on your person that I should be concerned about? And Mr. Willis says, I have a gun. So in that situation you're describing where he is still free to leave, but he just happens to ask this question. I don't believe he really is. I'm not sure he is. But I'm asking in that circumstance, can the officer legitimately ask, do you have anything on your person that I should be concerned about? And he responds, I have a gun. What happens? Is that suppressible? Because at this point the nature of the stop is not quite the same, and it could be an ordinary sort of traffic stop that might or might not lead to a ticket for crossing a double yellow line or making an illegal U-turn or whatever sort of thing he had in mind. I don't want to concede that that's not suppressible, because I actually think that that question is exactly like a pat-down and that that's exactly why this officer frames the question that way. Because when he starts to talk about officer safety, he says that that's why he asks him that question, so that's exactly the answer that he expected one way or the other was, I have a gun. And so, I mean, I don't want to sort of project in a different situation that that is permissible when you have sort of less of a detention, but you still have this question, which is very akin to a pat-down. So I'm sort of not willing to concede that. I just want to make one other point, which, if I can just indulge me in the time, that the community caretaking function is originally sort of based on the idea that it's divorced from investigation. We certainly don't have the community caretaker, when they talk about it in Katie for the first time, they're talking about a situation that's divorced from criminal investigation. Here, you really get the sense that it's a fallback from a criminal investigation that is lacking something. And also, just one final point on sort of the integrity of the database, which, Judge Kaczynski, you mentioned, the magistrate found that there was no evidence of the record of how long it normally takes to clear a missing person's report and that the record was silent on whether the Las Vegas police did what they were supposed to do. And I don't think there's any case where the police are relying on their own bad information. Does it really matter if we say a week's not unreasonable? Does it really matter? I think that... A week's tax is not unreasonable. I understand that response in terms of saying just on a timeline, a week is not unreasonable. Many months is unreasonable. You bring up the case where it's six months, and then we may give you a different answer. Right. I mean, I understand that response, but I think if you look at Justice O'Connor's concurrence in Arizona v. Evans, it's the reasonableness of the reliance on the database, not necessarily a particular time. But we don't know what happened here. There are many links in the chain, and we don't have a fact-finding process that can tell us or has told us and probably can tell us what happened. You've got different law enforcement agencies in different states. I don't exactly know how the clearance... And there may be some federal involvement, too, in this database. No, just the federal rules that set up the NCIC, which says that Escondido was responsible for taking it out, but they needed the locate to take it out. That's sort of clear. Yeah, well... And to that issue, I would say the burden's on the government to come forward with that, and the magistrate said there was no evidence of what was reasonable or how long it takes. So with that, I appreciate the time you've given to this matter. Thank you. Thank you. Okay. Thank you, Counsel. Case is all yours. Thanks, Matt. You all don't make it easy on us. Good counsel always makes the court's job more difficult.
judges: Kozinski, W. Fletcher, Bybee